

**Signed November 03, 2020.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| GABRIEL INVESTMENT GROUP, INC., ET AL., § | CASE NO. 19-52298-RBK | |
| § | | |
| DEBTORS § | CHAPTER 11 | |
| _____ § | | |
| § | | |
| GABRIEL INVESTMENT GROUP, INC., § | | |
| § | | |
| PLAINTIFF § | | |
| § | | |
| V. § | ADVERSARY NO. 20-05010-RBK | |
| § | | |
| TEXAS ALCOHOLIC BEVERAGE COMMISSION, § | | |
| § | | |
| DEFENDANT § | | |

### OPINION

This adversary proceeding focuses entirely on a question of statutory interpretation of the provision of the Texas Alcoholic Beverage Code that governs which entities in Texas may and may not operate retail liquor stores, also known as "package stores." In general, the Texas Alcoholic Beverage Code prohibits public corporations from holding permits to own or operate

package stores ("package store permits," or "P Permits"). Plaintiff, Gabriel Investment Group, Inc. ("GIG"), a public corporation as defined by the Texas Alcoholic Beverage Code, nevertheless holds a P Permit through a grandfather exemption to the general prohibition on public-corporation ownership of P Permits. GIG filed this chapter 11 case, confirmed a plan, and filed this adversary proceeding seeking a declaratory judgment that this grandfather exemption, and thus its rights as holder of a P Permit, will survive regardless of whether GIG stock is purchased by a separate, non-exempt public corporation. Both GIG and defendant the Texas Alcoholic Beverage Commission ("TABC") filed competing motions for summary judgment on this issue. Because the Court believes that the Texas Alcoholic Beverage Code would not allow a public corporation to hold or benefit from a P Permit simply by purchasing GIG stock, regardless of GIG's grandfather exemption, the Court has granted summary judgment to TABC and denied summary judgment to GIG. This opinion states the reasons for granting TABC's motion and for denying GIG's motion. *See* FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.

**I.     JURISDICTION AND VENUE.**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(c) and 1334(b). This matter is a non-core proceeding related to a case under title 11 referred to the Court by the Standing Order of Reference in the Western District of Texas. Venue is proper pursuant to 28 U.S.C. § 1409.

**II.    BACKGROUND.**

Chapter 22 of the Texas Alcoholic Beverage Code governs the issuance of package store permits, or "P Permits," which are required to purchase liquor from wholesalers and to sell liquor in unbroken original containers for off-premises consumption. *See* TEX. ALCO. BEV. CODE

§ 22.01. Section 22.16 of the Texas Alcoholic Beverage Code prohibits a public corporation from directly or indirectly holding a P Permit. *See id.* § 22.16(a). Specifically, the statute states:

> A package store permit may not be owned or held by a public corporation, or by any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation, or by any entity which would hold the package store permit for the benefit of a public corporation.

*Id.* For purposes of section 22.16, a "public corporation" is defined as either "any corporation or other legal entity whose shares or other evidence of ownership are listed on a public stock exchange" or "any corporation or other legal entity in which more than 35 persons hold an ownership interest in the entity." *Id.* § 22.16(b). GIG falls within this definition of a public corporation.

Despite its general prohibition on public corporations owning or holding P Permits, section 22.16 does provide a "grandfather" clause exempting certain public corporations from the public-corporation prohibition. Section 22.16(f) provides:

> This section shall not apply to a corporation:
>
> (1) which was a public corporation as defined by this section on April 28, 1995; and
>
> (2) which holds a package store permit on April 28, 1995, or which has an application pending for a package store permit on April 28, 1995; and
>
> (3) which has provided to the commission on or before December 31, 1995, a sworn affidavit stating that such corporation satisfies the requirements of Subdivisions (1) and (2).

*Id.* § 22.16(f). Neither party disputes that GIG qualifies for this exemption.

GIG's confirmed plan of reorganization implemented a "divisive merger" whereby GIG separated into two distinct entities: (1) an operating entity that will continue to operate package stores as a privately held corporation, and (2) a public corporation, i.e., GIG, that will be sold to

pay the debts owed to various creditors, including creditors of the operating entity. GIG's value depends in large part on its ability to operate package stores—and thus on the continuing validity of its P Permits and its grandfather exemption from the public-corporation prohibition.

GIG thus seeks a declaration that: (1) GIG is and will remain exempt from the public-corporation ban set forth in section 22.16(a) regardless of whether any future direct or indirect owner(s) of all or any portion of the issued and outstanding stock of GIG is itself a public corporation; and (2) the rights and privileges associated with GIG's section 22.16(f) exemption from the public-corporation ban will continue unimpaired following any acquisition of all or any portion of GIG's issued and outstanding stock.

TABC filed a motion for summary judgment arguing that the Court should deny GIG's requested relief. GIG subsequently filed its own motion for summary judgment arguing that it is entitled to its requested declaratory judgment. The facts are not in dispute.

### III. DISCUSSION.

#### A. Summary Judgment Standard.

"Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." ***Malacara v. Garber***, 353 F.3d 393, 398 (5th Cir. 2003) (citing ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986)). The Court must grant summary judgment "only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" ***Lifecare Hosps., Inc. v. Health Plus of La., Inc.***, 418 F.3d 436, 439 (5th Cir. 2005) (quoting FED. R. CIV. P. 56(c)); *see also* ***Lowe v. King (In re King)***, Bankruptcy No. 05–56485–C, Adversary No. 06–5122–C, 2006 WL 3861097, at *2 (Bankr. W.D. Tex. Dec. 29, 2006) (applying the same standard). Where, as here, the parties file

cross-motions for summary judgment, the Court may "assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." ***Atl. Richfield Co. v. Farm Credit Bank of Wichita***, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting ***James Barlow Family Ltd. P'ship v. David M. Munson, Inc.***, 132 F.3d 1316, 1319 (10th Cir. 1997)); *accord* ***Petro Harvester Operating Co. v. Keith***, 954 F.3d 686 (5th Cir. 2020).

### B. Statutory Interpretation.

This case revolves entirely around the interpretation of a Texas statute. Federal courts interpreting Texas statutes must "follow the same rules of construction that a Texas court would apply." ***Wright v. Ford Motor Co.***, 508 F.3d 263, 269 (5th Cir. 2007). When construing a statute, Texas courts' "primary objective is to give effect to the Legislature's intent." ***Colorado County v. Staff***, 510 S.W.3d 435, 444 (Tex. 2017) (citing ***Greater Hous. P'ship v. Paxton***, 468 S.W.3d 51, 58 (Tex. 2015)). To determine that intent, Texas courts look first to the statutory text. *Id.* (citing *Greater Hous. P'ship*, 468 S.W.3d at 58). When Texas courts interpret statutes, they "presume lawmakers chose statutory language 'with care and that every word or phrase was used with a purpose in mind.'" ***Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Envtl. Quality***, 576 S.W.3d 374, 384 (Tex. 2019) (quoting ***Tex. Lottery Comm'n v. First State Bank of DeQueen***, 325 S.W.3d 628, 635 (Tex. 2010)). Texas courts do not consider words and phrases in isolation, but rather read statutes to give effect to every word. *See* ***El Paso Educ. Initiative, Inc. v. Amex Props., LLC***, 602 S.W.3d 521, 531–32 (Tex. 2020) (citing *Brazos*, 576 S.W.3d at 384).

Where the text is clear, the text is determinative of intent. *Brazos*, 576 S.W.3d at 384 (citing ***Entergy Gulf States, Inc. v. Summers***, 282 S.W.3d 433, 437 (Tex. 2009)). "'The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent

from the context or the plain meaning leads to absurd or nonsensical results.'" *Staff*, 510 S.W.3d at 444 (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)). A court may only look "beyond [a statute's] language for assistance in determining legislative intent [if] the statutory text is susceptible to more than one reasonable interpretation." *Id.* (citing *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012)).

Even when a statute is not ambiguous on its face, however, Texas courts "can consider other factors to determine the Legislature's intent, including: the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (citing TEX. GOV'T. CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 350 (Tex. 2000)).

### C. Analysis of Section 22.16.

#### a. The Parties' Arguments

GIG's primary argument in favor of its position is that the grandfather exemption contained in section 22.16(f) negates the application of the entirety of section 22.16 for a corporation that meets subsection (f)'s three criteria. Subsection (f) states that "[t]his section shall not apply to a corporation" that meets those criteria. *See* TEX. ALCO. BEV. CODE § 22.16(f). It is undisputed that GIG meets subsection (f)'s criteria and thus qualifies for the grandfather exemption. GIG argues, then, that the plain language of subsection (f) mandates that the remainder of section 22.16, including the general public-corporation prohibition in subsection (a), does not apply to GIG at all regardless of GIG's ownership. Thus, if GIG were to sell its stock to a separate public corporation,

any P Permits that GIG holds subject to the grandfather exemption will remain active and valid even though they would be directly or indirectly owned by or held for the benefit of that separate public corporation.

TABC, on the other hand, argues that the language of the statute leads to the opposite conclusion. TABC argues that the ban in subsection (a) applies to "permits," whereas the grandfather exemption in subsection (f) applies more narrowly to "corporations" that meet the criteria,[1] and meeting those criteria is the only way a public corporation can avail itself of the grandfather exemption. TABC posits that these two subsections should be read together to prohibit any corporation that does not qualify for the grandfather exemption from obtaining an interest in a P Permit, regardless of whether that interest is held through a separate, exempt corporation. This reading would hold that subsection (a) broadly prohibits public corporations from having any interest in a P Permit, and, because subsection (f) applies narrowly to corporations, only public corporations that meet subsection (f)'s criteria may hold an interest in a P Permit.

TABC further argues that the broad language of section 22.16(a)'s public-corporation prohibition indicates that the public policy of the State of Texas is to prohibit public corporations from owning or holding P Permits. TABC asserts that GIG's interpretation renders the prohibition meaningless by allowing a public corporation to own or hold P Permits by purchasing the stock of a company exempted by subsection (f)'s grandfather clause even though the purchasing corporation does not itself qualify for the grandfather exemption. According to TABC, the Texas Legislature's intent in including the grandfather exemption was to preserve the rights of P Permit holders who would otherwise have been affected by the public-corporation prohibition, not to give

---

[1] Subsection (a) states: "A *package store permit* may not be owned or held by a public corporation . . . ." TEX. ALCO. BEV. CODE § 22.16(a) (emphasis added). Subsection (f) states: "This section shall not apply to a *corporation*" that satisfies the criteria. *See id.* § 22.16(f) (emphasis added).

7

grandfather-exempted corporations greater rights than those of other P Permit holders by allowing them to sell stock to non-exempt public corporations. TABC points to a separate provision of the Texas Alcoholic Beverage Code that prevents "subterfuge ownership of or unlawful use of a permit or the premises covered by such permit" and that states that "all provisions of this code shall be liberally construed to carry out this intent." *See* TEX. ALCO. BEV. CODE § 109.53. TABC argues that, because GIG's plan serves no purpose but to evade the public-corporation ban, the Court should deny GIG's request for a declaratory judgment.

### b. Textual Interpretation

Both GIG and TABC offer textual arguments in support of their respective positions. GIG interprets subsection (f), which states that section 22.16 "shall not apply to a corporation" that satisfies subsection (f)'s criteria, to mean that any corporation meeting those criteria is exempt from section 22.16 writ large. GIG would thus have the Court hold that GIG, which satisfies subsection (f)'s criteria, is exempt from section 22.16's general public-corporation prohibition regardless of whether a separate, non-exempt public corporation were to purchase GIG stock. TABC argues that subsection (a) relates to permits, whereas subsection (f) relates narrowly to corporations. Thus, though an individual corporation may be exempt from the general prohibition by way of subsection (f), subsection (a)'s focus on ***permits*** rather than ***corporations*** means that a P Permit may not be held for the ultimate benefit of a non-exempt corporation regardless of whether the corporation actually owning or holding the P Permit is exempt.

A third interpretation not specifically addressed by either party, but similar in nature to TABC's interpretation, would focus on section 22.16's use of the words "entity" and "corporation." Subsection (a) reads:

> A package store permit may not be owned or held by a public ***corporation***, or by any ***entity*** which is directly or indirectly owned

8

> or controlled, in whole or in part, by a public *corporation*, or by any *entity* which would hold the package store permit for the benefit of a public *corporation*.

*Id.* § 22.16(a) (emphasis added). Subsection (a) thus uses both the word "entity" and the word "corporation." Subsection (f), by comparison, uses only the word "corporation"—section 22.16 "shall not apply to a *corporation*" that meets the criteria. *Id.* § 22.16(f) (emphasis added). Subsection (f) does not use the word "entity" at all. *See id.* This usage implies that the word "corporation" in subsection (f) is tied to the word "corporation" in subsection (a). When a "'legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense . . . .'" *Staff*, 510 S.W.3d at 452 (quoting **Brown v. Darden**, 50 S.W.2d 261, 263 (Tex. 1932)). This rule "'applies when the phrases are substantially the same.'" *Id.* (citing *Brown*, 50 S.W.2d at 263). Thus, the use of the word "corporation" in both subsection (a) and subsection (f), and the use of the word "entity" in subsection (a) but its absence from subsection (f), leads to the conclusion that the two subsections focus on the *corporation* that ultimately benefits from the P Permit.

Subsection (a) prevents three types of businesses from owning or holding a P Permit: (1) "a public *corporation*;" (2) "any *entity* which is directly or indirectly owned or controlled, in whole or in part, by a public *corporation*;" or (3) "any *entity* which would hold the package store permit for the benefit of a public *corporation*." TEX. ALCO. BEV. CODE § 22.16(a) (emphasis added). The grandfather clause in subsection (f) provides an exemption to this general rule, but only to the *corporation* indicated in each of these three scenarios. That is, if a public corporation owns or holds a P Permit, it may do so if it also qualifies for the grandfather exemption. But if a P Permit is owned or held by an entity *owned by* a public corporation or *for the benefit of* a public

9

corporation, subsection (f) would have us look to the corporation that owns the entity holding the P Permit or to the corporation for whose benefit the entity holds the P Permit. If that public corporation does not meet subsection (f)'s criteria, and thus does not qualify for the grandfather clause, subsection (a) would not allow that corporation to benefit from the P Permit.

This interpretation can be illustrated by applying it to the current case. Until now, GIG has existed only as one of the three business forms prohibited by subsection (a), i.e., a public corporation that owns or holds a P Permit. *See id.* § 22.16(a). GIG has been exempted from this prohibition because it qualifies for subsection (f)'s exemption. Were GIG to sell its stock to a separate public corporation, however, it would also become the other two business forms prohibited by subsection (a), i.e., an "*entity* which is directly or indirectly owned or controlled, in whole or in part, by a public corporation" and an "*entity* which would hold the package store permit for the benefit of a public corporation." *See id.* (emphasis added). GIG would still be a public corporation that owns or holds a P Permit, and if the analysis were to end there, subsection (f)'s exemption would still apply—GIG would be allowed to continue owning and holding its P Permit. But GIG would now also be an *entity* owned or controlled by a public corporation, as well as an *entity* which would hold the P Permit for the benefit of a public corporation. The hypothetical public corporation that would now own GIG's stock would not itself qualify for subsection (f)'s exemption. Thus, subsection (a) would not allow the hypothetical public corporation to benefit from GIG's P Permit, even though GIG itself qualifies for the exemption.

The Court is convinced that this interpretation of the statute's text is most illustrative of the Texas Legislature's intent. The Court also believes, though, that the alternative interpretations put forth by the parties are reasonable as well. Because the "statutory text is susceptible to more than one reasonable interpretation," the Court may look "beyond its language for assistance in

10

determining legislative intent." *See Staff*, 510 S.W.3d at 444 (citing *Ruttiger*, 381 S.W.3d at 452). The Court will thus look to the legislative history of section 22.16 for guidance.

### c. Legislative History

Neither of the parties introduced into the record any evidence of the legislative history of 22.16. Courts, however, may take judicial notice of legislative history, and the Court elects to do so here. *See* **Territory of Alaska v. Am. Can Co.**, 358 U.S. 224, 226–27 (1959) (taking judicial notice of the legislative history of a bill with reference to state House and Senate Journals). For evidence of the statute's legislative history, the Court has looked to recordings of Texas House and Senate floor debates. The statute's legislative history was also analyzed by Judge Robert Pitman of the Western District of Texas in a recent case dealing with section 22.16. *See* **Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n**, 313 F. Supp. 3d 751 (W.D. Tex. 2018), *aff'd in part, vacated in part, reversed in part by* 945 F.3d 206 (5th Cir. 2019), *petition for cert. filed*, (U.S. June 12, 2020) (No. 19-1368). The Court has also looked to Judge Pitman's opinion and the record in those proceedings for evidence of section 22.16's legislative history, and the Court may also take judicial notice of such. *See* **Banque de Paris et des Pays-Bas (Suisse) S.A. v. Arhens (In re Arhens)**, 120 B.R. 852, 854 (Bankr. S.D. Tex. 1990) (holding that a bankruptcy court "may take judicial notice of the docket entries and pleadings filed in civil actions" in its district); *see also* **Casarez v. Tex. Roadhouse of El Paso-West, Ltd.**, EP-12-CV-00117-DCG, 2013 WL 11310683, at *1 n.3 (W.D. Tex. Feb. 13, 2013) (taking judicial notice of the docket entries in a separate proceeding in the district (citing *In re Arhens*, 120 B.R. at 854)).

A review of this legislative history demonstrates that the intent of the Texas Legislature, and the policy of the State of Texas, is to prohibit large corporations from owning and operating package stores in order to ensure accountability of package-store owners. Section 22.16 was

drafted by Fred Niemann, Jr., a lawyer and lobbyist for the Texas Package Store Association, a trade association of package stores that are majority-owned by Texans. *Wal–Mart*, 313 F. Supp. 3d at 757, 760. Before both the Texas House of Representatives and the Texas Senate State Affairs Committee, Niemann testified that the primary purpose for the statute was "to ensure that [package store] owners were known within their community and could be held accountable for responsible operation in a fashion sensitive to community standards" and "to have real live human beings who are easily identifiable who are close to the business and who ultimately bear personal responsibility for the actions of the package store." Debate on House Bill 2367, 74th Leg., R.S. 4:14–5:3 (March 29, 1995) (transcript available at *Wal–Mart*, 313 F. Supp. 3d 751 (No. 1:15-cv-00134-RP), ECF No. 311-26); *see also* Transcript of Senate State Affairs Committee Discussion of SB 1063, 74th Leg., R.S. 9:19–10:12 (March 20, 1995) (transcript available at *Wal–Mart*, 313 F. Supp. 3d 751 (No. 1:15-cv-00134-RP), ECF No. 311-26). This rationale was echoed by Senator Kenneth Armbrister, the bill's sponsor, during the Senate floor debate on the public-corporation ban. When asked by a colleague whether the Legislature "wanted to have somebody from Texas with the license that you get hold of . . . to enforce the Code," Senator Armbrister responded by saying, "That's correct." *See* Transcript of Senate Floor Debate of SB 1063, 74th Leg., R.S. 7:10–16 (March 28, 1995) (transcript available at *Wal–Mart*, 313 F. Supp. 3d 751 (No. 1:15-cv-00134-RP), ECF No. 311-26).

In addition to this testimony, Judge Pitman also found that another strong reason for the public corporation prohibition was a fear that "'very large stores could disrupt what had been a very stable business climate'" for smaller package-store owners and that the statute was driven by the idea that "'big stores had come into Texas' and 'had driven out of business most mom-and-pop and local businesses.'" *Wal–Mart*, 313 F. Supp. 3d at 760. In conjunction, this evidence of

the legislative history of section 22.16 demonstrates that the public policy of the State of Texas is to prevent large public corporations from operating package stores in order to ensure the accountability and identifiability of package-store owners and in order to protect small, family-owned package-store businesses from being put out of business by large corporations.

The Court acknowledges that the intent of a statute's author "is not legislative history controlling the construction to be given a statute," but such intent may be "persuasive authority as might be given the comments of any learned scholar of the subject." *See* ***Gen. Chem. Corp. v. De La Lastra***, 852 S.W.2d 916, 923 (Tex. 1993). The testimony of Mr. Niemann, the statements of Senator Armbrister, and other legislative history reviewed by the Court thus serve to bolster the Court's interpretation of the statutory text.

In light of the public policy of the State of Texas as revealed through this legislative history, it seems clear to the Court that the Legislature's intent in enacting section 22.16 was to prevent large public corporations from operating package stores in Texas. To allow a non-exempt public corporation to benefit from a P Permit held by GIG by way of subsection (f)'s grandfather exemption simply by purchasing GIG stock would undermine this policy. The Court is not persuaded that the statute would allow such a result. The Court thus holds that, were GIG stock to be purchased by a separate public corporation that itself does not qualify for subsection (f)'s exemption, any P Permit that GIG holds subject to the exemption would not remain valid for so long as GIG would be owned, directly or indirectly, by a non-exempt public corporation or for so long as GIG would own or hold a P Permit for the benefit of a non-exempt public corporation.

**IV.    CONCLUSION.**

The Court's reading of the text of section 22.16, when combined with a review of the legislative history, indicates a clear legislative intent to prevent large public corporations from owning, holding, or benefiting from a P Permit, either directly or indirectly. Thus, despite GIG's

own exemption from the public-corporation prohibition via the grandfather clause in subsection (f), any public corporation that would seek to purchase GIG stock would be prevented from owning, holding, or benefiting from a P Permit. GIG's request for a declaratory judgment has been **DENIED**, as has been GIG's motion for summary judgment. Conversely, TABC's motion for summary judgment has been **GRANTED** by separate order.

# # #